IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DANIELLE RICHARDSON,
     Plaintiff,

v.

HAPAG-LLOYD (AMERICA), LLC,
     Defendant.

CIVIL ACTION NO.

1:22-cv-3275-SDG-CMS

## **FINAL REPORT AND RECOMMENDATION**

Plaintiff Danielle Richardson filed this lawsuit against Defendant Hapag-Lloyd (America), LLC ("Hapag-Lloyd"), her former employer.  [Doc. 1, Compl.]. Richardson alleges that (1) Hapag-Lloyd interfered with her medical leave and then retaliated against her for taking that leave in violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq. ("Count One") [*id.* ¶¶ 62–72], and (2) Hapag-Lloyd discriminated against her based on her race, color, and sex and retaliated against her in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e et seq. ("Count Two") [*id.* ¶¶ 73–83]. Pending before the Court is Hapag-Lloyd's Motion for Summary Judgment.  [Doc. 42].  Richardson filed a response opposing the motion [Doc. 45], and Hapag-Lloyd filed a reply in support of it [Doc. 47].  For the reasons stated below, I will recommend that the motion for summary judgment be **GRANTED**.

I.    **BACKGROUND**[1]

I find the following facts for the purpose of resolving Hapag-Lloyd's pending motion for summary judgment only.

A.    **The Parties**

Hapag-Lloyd is an international shipping and container transportation company.  [Doc. 43, Def.'s Statement of Material Facts ("SMF") ¶ 1; Doc. 45-8, Pl.'s Response to SMF ("RSMF") ¶ 1; Doc. 42-13, Decl. of Mariel Calello "Calello Decl." ¶ 2].  In April 2019, Hapag-Lloyd hired Richardson, a Black female, as a Transport Dispatch Coordinator ("TDC").  [SMF ¶ 2; RSMF ¶ 2; Doc. 42-1, Dep. of Danielle Richardson "Richardson Dep." Ex. 34 (Doc. 42-7 at 36)].  Richardson was an at-will employee.  [SMF ¶ 2; RSMF ¶ 2; Richardson Dep. at 78–79].  During her employment, Richardson received training on Hapag-Lloyd's policies and had access to Hapag-Lloyd's EEO policy.  [SMF ¶ 3; RSMF ¶ 3; Richardson Dep. at 81, 83; Richardson Dep. Ex. 3 (Doc. 42-2 at 8–9), Ex. 6 (Doc. 42-2 at 13–20)].

---

[1] For purposes of this Report and Recommendation, citations to the record are made to the CM/ECF heading at the top of the page cited, except for depositions, where the citations are to the page number of the hard copy deposition transcript.

### B.  Expectations for Richardson's Employment

Hapag-Lloyd's Customer Service Director, Diana Collar, prepared a checklist that included daily and weekly job duties that an employee in Richardson's TDC position was expected to complete.  [SMF ¶ 4; RSMF ¶ 4].  The checklist included the following duties: (1) clearing the employee's que daily, (2) reviewing dwell times for containers, (3) communicating with detail so that questions did not have to be asked more than once, and (4) being polite and respectful.  [SMF ¶ 4; RSMF ¶ 4; Richardson Dep. at 81, 84; Richardson Dep. Ex. 8 (Doc. 42-2 at 23)].  TDCs also were required to proactively monitor a report that showed all containers that were within their geographical areas to ensure that the TDCs created a work order and got the containers assigned to drivers who would deliver the containers to clients (a process referred to as "clearing the que"), as well as to ensure that the containers assigned to drivers moved to the clients (a process referred to as "reviewing dwell times").  [SMF ¶ 5; RSMF ¶ 5; Doc. 42-9, Dep. of Michael Scallan "Scallan Dep." at 24–27, 40–45].

During the relevant period, Michael Scallan was Hapag-Lloyd's Transport Dispatch Manager and Richardson's direct supervisor.  [SMF ¶ 6; RSMF ¶ 6; Scallan Dep. at 17, 21].  Scallan reported to Collar and oversaw approximately eighteen Transport Dispatch employees.  [SMF ¶ 6; RSMF ¶ 6; Scallan Dep. at 17,

21].  Scallan received training concerning problem resolution, compliance, diversity and inclusion, employee rights, the FMLA, and management.  [Scallan Dep. at 33–36].

### C.   Richardson's Performance Issues and Her Relationship with Scallan

From the beginning of Richardson's employment through November 2020 (when Richardson first used FMLA leave), Scallan emailed Richardson and HR about various performance issues on Richardson's part.  [Richardson Dep. at 95–101, 103; Richardson Dep. Ex. 10 (Doc. 42-2 at 26–27), Ex. 11 (Doc. 42-2 at 28–33), Ex. 31 (Doc. 42-7 at 17–20)].  Those issues included failing to provide a doctor's note in December 2019, failing to cancel work orders in January 2020, and failing to communicate all information in the original response in April 2020.  [Richardson Dep. at 95–99; Richardson Dep. Ex. 10 (Doc. 42-7 at 17–20), Ex. 11 (Doc. 42-7 at 17–20), Ex. 31 (Doc. 42-7 at 17–20)].   During her deposition, Richardson acknowledged that she was behind in her work in April 2020, that she needed to improve her phone usage in July 2020, and that she was behind in her work in October 2020, but she noted that system errors sometimes caused her to be behind in her work.  [Richardson Dep. at 100, 101–102, 104, 197].

Richardson's review for the year 2020, known as a Global Staff Dialogue ("GSD"), showed that Richardson only partially met targets concerning dwell

reports, tracing, knowledge about the company and its products, asking for feedback, and dealing with feedback constructively. [Richardson Dep. Ex. 29 (Doc. 42-7 at 6–15)]. The GSD also indicated that Richardson needed improvement in proactively developing her job knowledge and skills. [*Id.*]. The GSD was supposed to have percentages to measure task completion; however, Richardson's GSD lacked those percentages. [Doc. 42-11, Dep. of Devin L. Harrington "Harrington Dep." at 79–82].

Richardson testified that she did not like working for Scallan and thought he was abrasive. [Richardson Dep. at 93–94]. In her view, most people who worked under Scallan found him to be abrasive and grouchy. [*Id.* at 94]. On approximately ten different occasions, Richardson complained to Devin Harrington, a mid-level supervisor and Scallan's subordinate, about Scallan's behavior toward her, including the way that Scallan spoke to her and the frequency with which Scallan reached out to her. [Harrington Dep. at 55-57]. Harrington advised Richardson that Scallan communicated with everyone in that way, and he did not investigate Richardson's complaints. [*Id.* at 57].[2]

---

[2] Harrington testified that four or five other people also complained to him about the way that Scallan interacted with them. [Harrington Dep. at 59–60, 98–100]. Harrington explained to some of those people that "this is how [Scallan's]

### D.     Richardson's    FMLA    Leave    and    Hapag-Lloyd's Communications with Richardson During that Leave

In August 2020, Richardson submitted a request for FMLA leave relating to the birth of her child.  [SMF ¶ 11; RSMF ¶ 11; Richardson Dep. at 105; Richardson Dep. Ex. 18 (Doc. 42-3 at 12–32)].  The forms that Richardson submitted informed Richardson that she would be required to furnish periodic reports about her status during her leave.  [SMF ¶ 11; RSMF ¶ 11; Richardson Dep. Ex. 18 (Doc. 42-3 at 12–32)].

On November 3, 2020, Richardson began her FMLA leave.  [Richardson Dep. at 107–108].  While Richardson was out on leave, Hapag-Lloyd communicated with her.  [*Id.* at 110, 112].  Specifically, on November 18, 2020, Scallan texted Richardson to ask if her VPN was working, and after Scallan realized that Richardson was on leave, he asked her to send photos of her baby.  [Richardson Dep. at 115; Richardson Dep. Ex. 20 (Doc. 42-4 at 4–10); Scallan Dep. at 94].  On November 19 and November 20, 2020, Scallan emailed HR Specialist Katelyn Miranda, copying Richardson, asking for confirmation of Richardson's return to work date.  [Richardson Dep. at 110, 112; Richardson Dep. Ex. 19 (Doc. 42-4 at 2–

---

messages come across," and he "never heard anything back after."  [*Id.* at 59].  Harrington noted that Scallan's "wording sometimes is a little strange."  [*Id.* at 60].

3); Scallan Dep. at 95; Doc. 45-3, Decl. of Danielle Richardson "Richardson Decl." ¶ 3; Doc. 45-5, Dep. of Katelyn Miranda "Miranda Dep." at 39–41].

Miranda also texted with Richardson to confirm her anticipated return to work date. [Richardson Dep. at 113; Richardson Dep. Ex. 20 (Doc. 42-4 at 4–10); Miranda Dep. at 36–38, 41]. Richardson responded to Miranda's texts by noting that she felt that Scallan was pressuring her to return to work early. [Richardson Dep. at 113, 166; Richardson Dep. Ex. 20 (Doc. 42-4 at 4–10); Doc. 45-8, Pl.'s Statement of Additional Facts ("SAF") ¶ 6; Doc. 48, Def.'s Response to SAF ("RSAF") ¶ 6]. Miranda responded that Richardson should not feel pressured to return and that she was entitled to take her full twelve weeks of leave. [Richardson Dep. Ex. 20 (Doc. 42-4 at 4–10)]. Miranda instructed Richardson to let her know if Scallan messaged her separately and she felt rushed. [*Id.*]. Richardson did not raise further concerns about her FMLA leave with Miranda. [Richardson Dep. at 117].

On January 8, 2021, while Richardson was still on FMLA leave, Scallan texted Richardson and asked permission to call her, saying that he had "good news." [Richardson Dep. at 115; Richardson Dep. Ex. 20 (Doc. 42-4 at 4–10); Scallan Dep. at 95]. Scallan then called Richardson and informed her about a pay raise. [Richardson Dep. at 115, 117; Scallan Dep. at 96]. Richardson testified that Scallan also told her about terminating Kammal King, a Black male TDC, that same day.

[Richardson Dep. at 117; Richardson Decl. ¶ 4].  King had returned from FMLA leave a month prior to his termination, and Richardson testified that she felt the call "was an intimidation tactic."  [Richardson Decl. ¶¶ 4–5].[3]

The parties agree that Richardson received the full twelve weeks of FMLA leave to which she was entitled; Richardson is not contending that she did not receive her FMLA leave. [Richardson Dep. at 115–16].

### E.  Richardson's Return to Work and Continued Performance Issues

On February 1, 2021, Richardson returned to work from FMLA leave.  [SMF ¶ 14; RSMF ¶ 14; Richardson Dep. at 115–116, 118–119].  On February 3, 2021, Scallan emailed Richardson and the entire Transport Dispatch team, sending a link to a dwell report called Qlikview that the TDCs should use to review the status of the dwells, and he requested that the team send him response emails confirming receipt of his email.  [SMF ¶ 14; RSMF ¶ 14; Richardson Dep. at 115–116, 118–119; Richardson Dep. Ex. 21 (Doc. 42-4 at 11–14)].  Richardson did not respond, and Scallan emailed her again on February 5, 2021.  [SMF ¶ 14; RSMF ¶ 14;

---

[3] Scallan denies relaying information about King's termination to Richardson during that phone call.  [Scallan Dep. at 96].  For purposes of resolving the motion for summary judgment, however, I have construed this fact dispute in favor of Richardson, the non-movant.

Richardson Dep. Ex. 21].  Richardson then acknowledged receipt of Scallan's email. [SMF ¶ 14; RSMF ¶ 14; Richardson Dep. Ex. 21].

On February 23, 2021, Scallan reminded Richardson that she needed to clear her que daily.  [SMF ¶ 15; RSMF ¶ 15; Richardson Dep. at 120; Richardson Dep. Ex. 22 (Doc. 42-4 at 15)].  On that same day, Scallan told Richardson that she could still work with the VPN down.  [SMF ¶ 16; RSMF ¶ 16; Richardson Dep. at 120; Richardson Dep. Ex. 23 (Doc. 42-4 at 16)].  Richardson responded to Scallan with "SMH," which was shorthand for "shaking my head."  [SMF ¶ 16; RSMF ¶ 16; Richardson Dep. Ex. 23 (Doc. 42-4 at 16)].

Richardson admits that she received emails in March and April 2021 about the need to clear her ques and check her dwells and that she knew Scallan was frustrated with her in March 2021.  [SMF ¶ 17; RSMF ¶ 17; Richardson Dep. at 121–122, 127–128; Richardson Dep. Ex. 24 (Doc. 42-4 at 17–19), Ex. 25 (Doc. 42-4 at 20–23), Ex. 26 (Docs. 42-5, 42-6)].  The frustration is further confirmed by evidence showing that Scallan reported to Collar and to HR Manager Heather Vaughn that Richardson was not clearing her ques daily and was not answering his questions or providing relevant information in response to his emails.  [SMF ¶ 17; RSMF ¶ 17; Richardson Dep. at 121–122, 127–128; Richardson Dep. Ex. 24 (Doc. 42-4 at 17–19), Ex. 25 (Doc. 42-4 at 20–23), Ex. 26 (Docs. 42-5, 42-6)].

### F.      Richardson's Other Job

In March 2021, without notifying Hapag-Lloyd, Richardson began working a second full-time job for another company.  [SMF ¶ 23; RSMF ¶ 23; Richardson Dep. at 56–59, 144, 154].  At her deposition, Richardson admitted that she continued working the second job during throughout the remainder of her employment with Hapag-Lloyd.  [SMF ¶ 23; RSMF ¶ 23; Richardson Dep. at 56–59, 144, 154].

### G.      The Performance Improvement Plan

By early April 2021, Collar wanted to place Richardson on a Performance Improvement Plan ("PIP").  [SMF ¶ 18; RSMF ¶ 18; Doc. 42-10, Dep. of Diana Collar "Collar Dep." Ex. 5 (Doc. 42-10 at 78–84)].  Collar first asked Vaughn to speak with Devin Harrington and Jessica Elste, the two mid-level Transportation Dispatch supervisors, to get their views of Richardson's performance.  [SMF ¶ 18; RSMF ¶ 18; Collar Dep. Ex. 5 (Doc. 42-10 at 78–84)].

On April 7, 2021, Vaughn spoke with Harrington.  [Harrington Dep. at 107–108].  Harrington stated that he liked Richardson as a person but noted that she was confrontational, blamed others, could not take constructive criticism, lacked motivation to perform better, was not capable of improving, fought with vendors, and slept in the office during work pre-COVID.  [*Id.* at 108–116; Harrington Dep. Ex. 1 (Doc. 42-12 at 23)].

On April 2, 2021, Vaughn spoke with Elste.  [Calello Decl. ¶ 25; Calello Decl. Ex. 1].  Elste stated that she had no direct experience with Richardson being rude to her.  [Calello Decl. Ex. 1].  Elste noted, however, that she had seen emails between Richardson and Scallan and that she knew that Richardson's "emails to [Scallan] are really rude."  [*Id.*]  Elste stated that Richardson's "overall tone seems very rude, and even insubordinate between she and [Scallan]."  [*Id.*].

Scallan and Collar prepared a PIP for Richardson that focused on clearing her que daily, reviewing her dwell reports, and communicating more professionally.  [Richardson Dep. Ex. 27 (Doc. 42-7 at 2–3)].   Richardson received a notification that Vaughn had called her and Scallan into a meeting via a telephone call on April 9, 2021.  [Richardson Decl. ¶ 9].  The purpose of the call was to place Richardson on a PIP.  [*Id.* ¶ 10].

On April 9, 2021, Scallan and Vaughn called Richardson to attempt to communicate the PIP.  [SMF ¶ 21; RSMF ¶ 21 (admitting this portion of SMF ¶ 21); Richardson Dep. at 129; Scallan Dep. at 97–98].  Scallan addressed Richardson's performance issues.  [Richardson Dep. at 129–130, 132–133].  Richardson noted that none of those issues were brought up in her GSD in December.  [*Id.* at 137].  During that phone call, Richardson told Scallan that he needed to find peace and stop wasting her time, because her performance was "impeccable."  [SMF ¶ 22; RSMF

¶ 22; Richardson Dep. at 139].   Richardson felt that the discussion was overwhelming, and Vaughn ended the phone call and gave Richardson the rest of the day to calm down.  [Richardson Dep. at 130–132].  Richardson testified that a new meeting or call was supposed to take place to continue the discussion about the PIP.  [*Id.* at 131, 134, 145; Richardson Decl. ¶ 10].

Following the April 9 phone call, Richardson sent Vaughn an email stating that she was exasperated with Scallan's treatment of her following her return from FMLA leave.  [Richardson Dep. at 172–173].  In her email, dated April 9, 2021, Richardson stated that Scallan had "been using intimidation tactics" toward her and had contacted her during her maternity leave.  [Richardson Dep. Ex. 39 (Doc. 42-7 at 46–47)].  In an email to Vaughn dated April 21, 2021, Richardson requested a thirty-day paid leave, stating that the request was due to Scallan's "discrimination, intimidation, and harassment tactics over the last several months."  [Richardson Dep. Ex. 41 (Doc. 42-7 at 49–50)].  Vaughn referred Richardson to Hapag-Lloyd's Employee Assistance Program, and Richardson took a paid leave of absence from April 13, 2021 to April 30, 2021.  [Richardson Dep. at 143–144, 173].

On April 26, 2021, Vaughn emailed Richardson a document titled "Hapag-Lloyd (America) LLC Performance Improvement Plan" and asked that she sign it electronically.  [Richardson Dep. at 128, 125; Richardson Dep. Ex. 27 (Doc. 42-7 at

2–3), Ex. 28 (Doc. 42-7 at 4–5)].  Richardson testified that she never read the PIP and refused to sign it.  [SMF ¶ 24; RSMF ¶ 24; Richardson Dep. at 128, 125; Richardson Dep. Ex. 28 (Doc. 42-7 at 4–5)].

On May 11, 2021, Miranda notified Richardson that her PIP was effective on May 3, 2021, and would continue for thirty days to give Richardson time to work on improving the items listed in the PIP.  [SAF ¶ 12; RSAF ¶ 12; Doc. 45-4, Dep. of Lisa Lorelli ("Lorelli Dep.") Ex. 17 (Doc. 45-4 at 152–155)].  On that same day, Scallan emailed Miranda asking if Richardson's failure to monitor dwells daily was grounds for termination or if Scallan had to wait until the end of Richardson's PIP to terminate her employment.  [SAF ¶ 13; RSAF ¶ 13; Lorelli Dep. Ex. 17 (Doc. 45-4 at 152–155)].  Scallan also sent another email to HR later that same day, copying Collar, forwarding an email exchange that he had with Richardson concerning cancelling a work order for a customer and commenting that Richardson was not complying with the portion of her PIP requiring her to maintain a professional demeanor and courteous communication.  [Richardson Dep. Ex. 33 (Doc. 42-7 at 31–35)].  On May 13, 2021, Collar emailed Richardson concerning Richardson's failure to handle a Trex exception report correctly.  [Richardson Dep. at 152].

### H.     HR's Consideration of Complaints About Scallan

Hapag-Lloyd's policies provide that an HR manager is supposed to investigate employee complaints, including interviewing the individuals involved and memorializing the investigation through email. [SAF ¶ 5; RSAF ¶ 5; Doc. 45-6, Dep. of Mariel Calello ("Calello Dep.") at 42–45]. Richardson complained to Vaughn that Scallan was verbally abusive. [Doc. 45-7, Dep. of Heather Vaughn ("Vaughn Dep.") at 45]. Vaughn does not remember further investigating Richardson's complaint, and there is no documentation of an investigation; however, Vaughn testified that she relayed Richardson's concerns to HR in New Jersey and followed the directions given to her. [*Id.* at 45–48].

On April 9, 2021, HR manager Lisa Lorelli sent an email to Hapag-Lloyd's HR Director Mariel Calello, informing Calello that Scallan "has apparently had various employee relations issues, as well as temporary employees complaining to the temp agency about training" and that Collar and Scallan "are looking to terminate [Richardson], who returned from leave after having a baby on 02/01 (she was hired as TD Coordinator 04/15/2019)." [Collar Dep. Ex. 3 (Doc. 42-10 at 67–71) at 1]. The email also indicated that Vaughn "is cautious at this point since there have been issues on [Scallan's] team . . . and he has a more stern, less tolerable management style." [*Id.*].

On April 13, 2021, Vaughn sent an email to Collar and others noting that she had "mentioned there seems to be a pattern within [Scallan's] team which could potentially be viewed as discrimination."  [Collar Dep. Ex. 4 (Doc. 42-10 at 72–77) at 3].  On April 21, 2021, Vaughn sent an email to HR Director Calello listing the following employees who had made complaints about Scallan or who were terminated by Scallan:

- Shonette Gaters – African American, FTE dismissed from her role by [Scallan].  Possible attorney suit, filed claim with EEOC
- Kammal King – African American, FTE.  Dismissed from his role by [Scallan]
- Shamonica Jones – African American, temporary employee, dismissed from her role by [Scallan]
- Estrellita Hayden – African American temporary employee, complaints to third-party agency regarding training and reported to [Scallan]
- Charissa Cunningham – African American temporary employee, complaints to third-party agency regarding training, reported to [Scallan].
- [Richardson] – African American, FTE, placed on a PIP by [Scallan] after returning from maternity leave, complaints to HR regarding [Scallan].
- Woonhak (Jonah) Kim – Asian American, Dismissed with Severance by [Scallan].

[*Id.* at 1].

Vaughn had an accident and unexpectedly went out on medical leave on April 28, 2021.  [Vaughn Dep. at 8; Collar Dep. at 43; Calello Decl. ¶ 26].  Hapag-Lloyd's senior management then took over the HR work in Atlanta.  [Collar Dep. at 43;

Lorelli Dep. at 15–17].   Because Vaughn was on  a leave of absence, the investigation of Richardson's complaints was not completed before Richardson's termination.  [Calello Decl. ¶ 26].

## I.   Richardson's Termination

On May 14, 2021, Richardson's computer indicated that she was not in "ready" mode for most of the day.  [Richardson Dep. Ex. 36 (Doc. 42-7 at 41–43) at 2–3].   Scallan messaged Richardson on Microsoft Teams ("Teams") that morning and asked her to get in "ready" status.  [*Id.*].  At 10:57 a.m., Richardson responded, stating, "I will once I'm finished."  [*Id.*].  At 1:36 p.m. that day, Scallan messaged Richardson again on Teams, stating, "Danielle you have been in 'meeting not ready' most of today . . . please make ready status."  [*Id.*].  Richardson responded, "I'm still in a meeting." [*Id.*].  Scallan asked, "with who"? [*Id.*].  Richardson stated, "private." [*Id.*].   Scallan asked, "can you elaborate please"?  [*Id.*].   At 1:57, Richardson responded with "myb."  [*Id.*].  Richardson admitted that "myb" meant "mind your business" and that it was possible that she was working at her other full-time job that day.  [SMF ¶ 27; RSMF ¶ 27; Richardson Dep. at 154].

Scallan emailed HR manager Lorelli and Collar concerning the above Teams exchange.  [Lorelli Dep. at 104].  Lorelli forwarded Scallan's message to HR Director Calello.  [Lorelli Dep. at 105; Calello Decl. ¶¶ 12–18; Calello Dep. at 68–

69; Calello Dep. Ex. 1 (Doc. 45-6 at 102-107)].   Calello reviewed the Teams exchange, and according to her declaration, decided to terminate Richardson's employment immediately due to insubordination and Richardson's documented performance issues.   [Calello Decl. ¶¶ 12–18, 27; Calello Dep. at 68–69].   Collar called Richardson and terminated her employment.  [Richardson Dep. at 158].

### J.   Richardson's Claims that She was Treated Less Favorably than Her White Co-Workers

Richardson complains that she was treated less favorably than her white co-workers throughout her employment with Hapag-Lloyd.  [Richardson Dep. at 195; Richardson Decl. ¶ 18].   Richardson testified that her white co-workers used profanity in Teams chats, but they were not reprimanded.  [Richardson Dep. at 195; Richardson Decl. ¶ 18].

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is authorized when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir. 1984).   The movant carries this burden by showing the court that there is "an absence of evidence to support the nonmoving

party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The court must view the evidence and all factual inferences in the light most favorable to the nonmoving party. *Adickes*, 398 U.S. at 158–59.

Once the moving party has adequately supported its motion, the nonmoving party must come forward with specific facts that demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The nonmoving party must "go beyond the pleadings" and present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324.  Generally, "[t]he mere existence of a scintilla of evidence" supporting the nonmoving party's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

When considering motions for summary judgment, the Court does not make decisions as to the merits of disputed facts. *See Anderson*, 477 U.S. at 249.  Rather, the Court only determines whether there are genuine issues of material fact to be tried.  Applicable substantive law identifies those facts that are material and those that are not. *Id.* at 248.  Disputed facts that do not resolve or affect the outcome of a suit will not properly preclude the entry of summary judgment. *Id.*

III.   **DISCUSSION**

As previously discussed, Richardson asserts several claims, including claims for FMLA interference and retaliation and claims for Title VII discrimination and retaliation.

A.      **FMLA Claims (Count One)**

"The FMLA grants eligible employees a series of entitlements, among them the right to 'a total of 12 workweeks of leave during any 12-month period' for a number of reasons." *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1267 (11th Cir. 2017) (quoting 29 U.S.C. § 2612(a)(1)).   Those reasons giving an employee a right to FMLA leave include "the birth of a son or daughter of the employee and in order to care for such son or daughter." 29 U.S.C. § 2612(a)(1)(A). "To preserve the availability of these rights, and to enforce them, the FMLA creates two types of claims: inference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act."   *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001) (citations omitted).

### 1.    FMLA Interference

"To prove FMLA interference, [a plaintiff] must demonstrate that: (1) [s]he was entitled to a benefit under the FMLA; (2) [s]he was denied that benefit; and (3) [s]he 'has been prejudiced by the violation in some way.'" *Bolden v. DeKalb Cnty. Sch. Dist.*, No. 1:20-cv-2725-MLB-CMS, 2021 WL 6936652, at *8 (N.D. Ga. Nov. 30, 2021) (quoting *Evans v. Books-A-Million*, 762 F.3d 1288, 1295 (11th Cir. 2014)), *adopted by* 2022 WL 1690537 (N.D. Ga. Feb. 18, 2022).   "In dealing with an interference claim [under the FMLA], the employer's motives are irrelevant." *Salem v. City of Port St. Lucie*, 788 F. App'x 692, 695 (11th Cir. 2019) (per curiam) (internal quotation marks and citations omitted).

Here, Richardson does not dispute that she received the full twelve weeks of FMLA leave that she was entitled to receive following the birth of her child. [Richardson Dep. at 115].  Rather, Richardson argues that Hapag-Lloyd interfered with her FMLA leave because Scallan subjected her to "persistent harassment and interference . . . regarding her return date from her FMLA leave."  [Doc. 45 at 9]. Richardson contends that "[e]mployees of Hapag-Lloyd repeatedly and unnecessarily contacted [Richardson] to ask when she would be coming back from maternity leave although her return date had been established and communicated." [*Id.*].

The evidence shows that employees of Hapag-Lloyd contacted Richardson during her FMLA leave on the following occasions: (1) Scallan texted Richardson once to ask whether her VPN was working and, after realizing that Richardson was on leave, to ask her to send photos of her baby [Richardson Dep. at 115; Richardson Dep. Ex. 20 (Doc. 42-4 at 4–10); Scallan Dep. at 94]; (2) Scallan emailed Miranda on November 19 and November 20, 2020, copying Richardson, asking when Richardson would return to work [Richardson Dep. at 110, 112; Richardson Dep. Ex. 19 (Doc. 42-4 at 2–3); Scallan Dep. at 95; Miranda Dep. at 39–41]; (3) Miranda texted with Richardson to confirm Richardson's anticipated return to work date [Richardson Dep. at 113, 166; Richardson Dep. Ex. 20 (Doc. 42-4 at 4–10); Miranda Dep. at 36–38]; and (4) Scallan texted Richardson to obtain permission to call her and, after obtaining permission, Scallan called Richardson [Richardson Dep. at 115; Richardson Dep. Ex. 20 (Doc. 42-4 at 4–10); Scallan Dep. at 95]. There is no evidence indicating that Richardson was asked or required to perform any work during her FMLA leave.

Even when these facts are viewed in the light most favorable to Richardson, the evidence does not support an interference claim under FMLA. First, "nothing in the FMLA indicates it ensures 12 workweeks of *undisturbed* leave." *Salem*, 788 F. App'x at 695 (emphasis in original). "To the contrary, regulations expressly allow

an employer to contact an employee while [s]he is on FMLA leave to discuss the employee's status," including the employee's intent to return to work. *Id.*; *see also* 29 C.F.R. § 825.311(a) ("An employer may require an employee on FMLA leave to report periodically on the employee's status and intent to return to work."). Scallan's emails to Miranda copying Richardson asking when Richardson would return to work, as well as Miranda's text exchange with Richardson concerning Richardson's planned return to work, were permissible under the FMLA and its regulations. Those contacts do not support a FMLA interference claim.

Second, "the FMLA does not create an absolute right to be left alone." *Simmons v. Indian Rivers Mental Health Ctr.*, 652 F. App'x 809, 819 (11th Cir. 2016) (per curiam). The Eleventh Circuit has concluded that "occasional and brief telephone calls of a limited nature" do not interfere with an employee's FMLA rights. *Id.* The handful of communications with Richardson during her FMLA leave, therefore, cannot constitute FMLA inference.[4]

---

[4] Richardson argues that the communications at issue were not "sporadic." [Doc. 45 at 10]. To support this argument, Richardson cites to *Pizarro v. Home Depot*, 634 F. Supp. 3d 1260 (N.D. Ga. 2022). [*Id.*]. *Pizarro*, however, does not involve the FMLA, retaliation, discrimination, or anything of the sort. 634 F. Supp. 3d at 1270. Instead, that case addressed claims by participants in a retirement plan for breach of fiduciary duties under the Employee Retirement Income Security Act. *Id. Pizarro*, therefore, does not help Richardson here.

Third, Richardson cannot establish an interference claim based on Scallan's January 2021 phone call to her.   Richardson complains that Scallan not only informed her about a raise during that telephone call but also told her that an employee who recently returned from FMLA leave had been terminated. [Richardson Dep. at 115, 117; Richardson Decl. ¶¶ 4–5].  Richardson contends that she felt pressured by the call.  [Richardson Decl. ¶¶ 4–5].  Richardson, however, has not shown that the brief phone call affected her leave or caused her to return from FMLA leave early, that the phone call actually prejudiced her in any way, or that she was required to perform any job duties as a result of that call.   Under those circumstances, this call cannot support an interference claim under FMLA.  *See Bolden*, 2021 WL 6936652, at *10 (recommending that summary judgment be granted in favor of the employer on an employee's FMLA interference claim where the employee failed to point to evidence showing that he was denied any FMLA benefit to which he was entitled, or that he was prejudiced in some way by the employer interfering with his FMLA leave).

For the above reasons, no genuine dispute remains as to Richardson's FMLA interference claim.  Summary judgment should be granted in favor of Hapag-Lloyd on this claim.

## 2.    FMLA Retaliation

Richardson also contends that Hapag-Lloyd retaliated against her for taking FMLA leave.   To succeed on a FMLA retaliation claim, "an employee must demonstrate that [her] employer intentionally discriminated against her in the form of an adverse employment action for having exercised an FMLA right." *Strickland*, 239 F.3d at 1207.  A plaintiff bringing a FMLA retaliation claim "faces the increased burden of showing that her employer's actions were motivated by an impermissible retaliatory or discriminatory animus." *Id.* (internal quotation marks omitted).

Where, like here, an employee alleges a retaliation claim under the FMLA without direct evidence of the employer's intent, courts apply the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S 792 (1973). *Batson v. Salvation Army*, 897 F.3d 1320, 1328–29 (11th Cir. 2018); *Strickland*, 239 F.3d at 1207.  Under the *McDonnell Douglas* framework, the employee first must establish a prima facie case of retaliatory discharge or retaliation.  *See, e.g. Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1162 (11th Cir. 2006); *Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 798 (11th Cir. 2000).  Once the plaintiff employee has established a prima facie case, the burden shifts to the defendant employer to proffer a legitimate, nondiscriminatory reason behind the complained-of employment action.  *Texas Dep't of Cmty. Affairs v. Burdine*, 450

U.S. 248, 254–56 (1981) ("*Burdine*"). This "burden is exceedingly light." *Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1061 (11th Cir. 1994) (internal quotation marks omitted and citation omitted). If the employer articulates a legitimate, non-discriminatory reason, the presumption of discriminatory intent created by the prima facie case is eliminated, and the plaintiff is given an opportunity to prove by a preponderance of the evidence that the legitimate reason offered by the employer is a pretext for discrimination. *Springer v. Convergys Customer Mgmt. Grp., Inc.*, 509 F.3d 1344, 1347 (11th Cir. 2007). The plaintiff retains the ultimate burden of persuading the finder of fact that the defendant acted with discriminatory intent. *Burdine*, 450 U.S. at 253.

### a. Prima Facie Case

To establish a prima facie case of retaliation under the FMLA, an employee must show that "(1) the employee engaged in statutorily protected conduct, (2) the employee suffered an adverse employment action, and (3) there is a causal connection between the two." *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1234–1235 (11th Cir. 2010). The employee can satisfy the causal connection element by showing that "the protected activity and the adverse action were not wholly unrelated." *Id.* (internal quotation marks omitted). Hapag-Lloyd argues that

25

Richardson cannot satisfy the third prong of her prima facie case.[5]  [Doc. 42-14 at 13].

"Close temporal proximity between an employee's protected conduct and the adverse action is generally sufficient to create a genuine issue as to whether there is a causal connection." *Salem*, 788 F. App'x at 696.  "[T]emporal proximity, without more, must be very close in order to satisfy the causation requirement." *Jones*, 854 F.3d at 1271–1272.  Further, "[t]emporal proximity, for the purpose of establishing the causation prong of a prima facie case of FMLA retaliation, should be measured from the last day of an employee's FMLA leave until the adverse employment action at issue occurs." *Id.* at 1272.

Here, Richardson's FMLA leave ended on February 1, 2021, and her termination occurred on May 14, 2021—more than three months later.  "In the absence of other evidence demonstrating causation, a three-month interval between the protected activity and the adverse action is too long to show causation through temporal proximity." *Davis v. Fla. Agency for Health Care Admin.*, 612 F. App'x

---

[5] I have assumed that the first two elements have been met because Richardson engaged in protected activity when she took FMLA leave and then suffered an adverse employment action when her employment was terminated.

983, 986 (11th Cir. 2015) (per curiam). Richardson, therefore, cannot show causation based solely on close temporal proximity.

Even if Richardson could show that close temporal proximity existed here, "intervening events can negate the inference of causation that may arise from temporal proximity." *Hollan v. Web.com Grp., Inc.*, No. 1:14-cv-426-LMM-WEJ, 2015 WL 11237023, at *21 (N.D. Ga. Apr. 7, 2015) (internal quotation marks omitted*), adopted by* 2015 WL 11237033 (N.D. Ga. July 1, 2015). Richardson's insubordination on the last day of her employment is a classic example of an intervening act that eliminates any causal connection that might arise based on temporal proximity. *See Hankins v. AirTran Airways, Inc.*, 237 F. App'x 513, 521 (11th Cir. 2007) (finding that an employee's intervening act of misconduct broke the causal connection based on temporal proximity between the employee's allegedly protected conduct and her termination). Because Richardson's insubordination eliminated any inference of causation based on temporal proximity, Richardson cannot show causation based on this theory.

Richardson contends that she can satisfy the causal connection requirement even absent close temporal proximity because (1) "she suffered harassment and pressure to return while she was on leave" [Doc. 45 at 16], (2) Scallan targeted Richardson [*id.*]; (3) Harrington could not point to Richardson's specific

performance issues during his deposition [*id.* at 16–17], (4) Hapag-Lloyd ignored Richardson's complaints about Scallan [*id.* at 17], (5) Richardson did not participate in the creation of the PIP [*id.* at 17–18], (6) Scallan wanted to fire Richardson before the PIP ended [*id.* at 18], and (7) Richardson's "myb" response was not truly insubordinate, and Richardson did not have a history of insubordination [*id.* at 18–19].  For the following reasons, all of Richardson's arguments fail.

First, as previously discussed, the evidence in the record belies Richardson's claim that she suffered harassment or was pressured to return early from FMLA leave or to do work while on leave.  Richardson received only two e-mails, three texts, and a single phone call during her FMLA leave, and she received all the FMLA leave to which she was entitled.  [Richardson Dep. at 110–116; Richardson Dep. Ex. 19 (Doc. 42-4 at 2–3), Ex. 20 (Doc. 42-4 at 4–10); Scallan Dep. at 94–95; Miranda Dep. at 37–38].  As previously noted, those sporadic contacts do not constitute "harassment" or "pressure" to return from leave.  Richardson simply offers her own conclusory statements to support her claim that Scallan's January 2021 telephone call was "an intimidation tactic." [Richardson Decl. ¶¶ 4–5].  Richardson, however, cannot create a genuine issue of material fact through conclusory allegations.  *See Hester v. Univ. of Ala. Birmingham Hosp.*, 798 F. App'x 453, 456 (11th Cir. 2020) (per curiam) ("[C]onclusory allegations and speculation are insufficient to create a

genuine issue of material fact."); *Walace v. Cousins*, 783 F. App'x 910, 913 (11th Cir. 2019) (per curiam) ("[A] conclusory affidavit cannot defeat summary judgment").[6]   Richardson, therefore, cannot use these communications to show causation.

Second, Richardson fails to point to any evidence other than her own conclusory statements to support her contention that Scallan somehow targeted her or singled her out for scrutiny.   The evidence in the record implies the opposite— four or five other employees complained to Harrington about Scallan and his interactions with them, while others complained to HR or to third-party agencies.

---

[6] Hapag-Lloyd also argues that Richardson cannot create a genuine issue of material fact based on self-serving allegations.  [Doc. 42–14 at 14; Doc. 47 at 1 & n.1].  This argument is inconsistent with Eleventh Circuit law.  *See United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018) ("An affidavit cannot be conclusory, but nothing in Rule 56 (or, for that matter, in the Federal Rules of Civil Procedure) prohibits an affidavit from being self-serving.") (citation omitted); *see also Blackburn v. Shire US Inc.*, 18 F.4th 1310, 1319–1320 (11th Cir. 2021) (noting that self-serving testimony based on personal knowledge or observation could be used to defeat summary judgment).   "Those cases that prohibit a party from defeating summary judgment by relying on self-serving statements[] involve situations where the plaintiff is making conclusory allegations that are not supported by personal knowledge." *Cherry v. Walkin Billboard, LLC*, No. 1:17-cv-3714-LMM-CCB, 2019 WL 13268178, at *9 (N.D. Ga. July 23, 2019) (internal quotation marks and citation omitted), *adopted by* 2019 WL 13268197 (N.D. Ga. Aug. 13, 2019).  "Where, on the other hand, the plaintiff is describing events that [s]he personally witnessed or conversations that [s]he participated in, a court must accept that testimony as true for summary judgment purposes." *Id.* (alteration in original) (internal quotation marks and citation omitted).

[Harrington Dep. at 59–60, 98–100; Collar Dep. Ex. 4 (Doc. 42-10 at 72–77) at 1]. In short, plenty of other employees apparently also had issues with Scallan's management style.

Third, Richardson claims that Harrington's testimony creates a fact issue as to whether she in fact had performance issues. In making this argument, Richardson mischaracterizes portions of Harrington's testimony and ignores other parts of it. For example, Harrington testified that he provided information to Vaughn indicating that Richardson had "peaked or plateaued," that Richardson's performance was not improving, and that Richardson's performance was not as good as it needed to be. [*Id.*; Harrington Dep. Ex. 1 (Doc. 42-12 at 23)]. Harrington testified that he informed Vaughn that Richardson blamed others and took everything as an attack. [Harrington Dep. at 111–112; Harrington Dep. Ex. 1 (Doc. 42-12 at 23)]. Harrington testified that Richardson had attitude issues and that she lacked motivation to get better. [Harrington Dep. at 112; Harrington Dep. Ex. 1 (Doc. 42-12 at 23)]. And Harrington also testified that he did not believe that Scallan's criticism of Richardson was unfair. [Harrington Dep. at 115]. Harrington's testimony, therefore, does not support Richardson's claim that she had few or no performance issues.

Fourth, Richardson argues that Hapag-Lloyd ignored and failed to investigate her complaints about Scallan. The evidence does not support this contention. Aside

from Richardson's text to Miranda that she felt pressured to return from FMLA leave, Richardson first specifically complained about Scallan intimidating or targeting her after the April 9 attempt to place Richardson on a PIP. [Calello Decl. ¶ 22; Richardson Dep. at 172–17; Richardson Dep. Ex. 39 (Doc. 42-7 at 46–47), 41 (Doc. 42-7 at 49–50)]. Vaughn forwarded Richardson's complaints to HR in New Jersey, and she followed the directions given to her. [Vaughn Dep. at 45–47]. Vaughn also began to gather background information to evaluate Richardson's complaints. [Calello Decl. ¶ 25]. It is undisputed that Vaughn went out on medical leave unexpectedly on April 28, 2021, and was unable to complete the investigation before the "myb" incident and Richardson's termination two weeks later. [Vaughn Dep. at 8; Collar Dep. at 43; Calello Decl. ¶ 26]. The evidence, therefore, does not support Richardson's claim that HR simply ignored her complaints.

Fifth, the fact that Richardson did not collaborate on the contents of her PIP does not show that she was terminated in retaliation for taking FMLA leave. HR created the PIP with input from Scallan and Collar, based on information that Scallan provided to Collar and Vaughn. [Scallan Dep. at 97–98]. Nothing other than Richardson's conclusory, unsupported assertion shows that Richardson's input was required for the PIP to be valid. [Richardson Decl. ¶ 12]. This conclusory assertion cannot establish causation.

Sixth, Richardson complains that Scallan was overly eager to terminate her, and that he wanted to terminate her before the PIP expired. Richardson, however, ignores evidence in the record demonstrating that Calello, not Scallan, made the ultimate decision to terminate Richardson's employment. [Calello Decl. ¶¶ 12–18, 27]. This argument, therefore, does not establish causation.

Seventh, Richardson argues that her "myb" comment was not insubordinate, and that she did not have a history of being insubordinate. Whether Richardson herself believed the "myb" comment was insubordinate is irrelevant. What matters is whether the decision-maker, Calello, felt the comment was insubordinate. Richardson failed to point to any evidence indicating that Calello did not believe the comment was insubordinate. The evidence instead demonstrates that Calello did believe that the "myb" comment was insubordinate. [Calello Decl. ¶¶ 14, 17–18].

Further, Richardson ignores evidence in the record demonstrating that she indeed had a history of insubordination. In an April 9, 2021 email to Vaughn, Richardson acknowledged that Scallan categorized her conduct as insubordination. [Richardson Dep. Ex. 39 (Doc. 42-7 at 46–47)]. Additionally, on April 2, 2021, the mid-level Transportation Dispatch supervisor Jessica Elste informed Vaughn that Richardson's "overall tone seems very rude, and insubordinate between she and

[Scallan]."  [Calello Decl. Ex. 1].   Richardson, therefore, cannot establish causation based on this argument.

For the above reasons, Richardson has failed to come forward with evidence to establish the causation element of her prima facie case for her FMLA retaliation claim.  Because Richardson cannot establish a prima facie case, summary judgment should be granted for Hapag-Lloyd.

If the district judge agrees with this conclusion, no further analysis of this claim is necessary.  In the interest of providing a complete report, however, I will address the remaining steps of the *McDonnell Douglas* burden-shifting framework.

### b.    The Stated Reasons for the Termination

If Richardson had established a prima facie case of FMLA retaliation, the burden would shift to Hapag-Lloyd to articulate a legitimate, nonretaliatory reason for terminating Richardson's employment.  *See Jones*, 854 F.3d at 1274.  Hapag-Lloyd states that it terminated Richardson based on insubordination and poor performance.   [Calello Decl. ¶¶ 12–18, 27; Calello Dep. at 68–69].  Those reasons satisfy Hapag-Lloyd's burden to articulate a legitimate, non-retaliatory reason for terminating Richardson.  *See Hankins*, 237 F. App'x at 521 (finding that employee misconduct was a legitimate, non-discriminatory reason for terminating an employee); *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993) ("An

employer's good faith belief that an employee's performance is unsatisfactory constitutes a legitimate non-discriminatory reason for termination."). The burden would then shift to Richardson to show pretext. *Hankins*, 237 F. App'x at 521.

### c.     Pretext

A plaintiff may show pretext "either directly by persuading the court that a [retaliatory] reason more likely motivated the employer or indirectly by showing that the employer's proffered [sic] explanation is unworthy of credence." *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (citation and quotation marks omitted). The plaintiff "must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc) (citations omitted). The plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [the defendant's] proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Jackson v. State of Ala. Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)). Further, "[t]he pretext inquiry focuses on the employer's beliefs, not the employee's." *McPhie v. Yeager*, 819 F. App'x 696, 699 (11th Cir. 2020) (emphasis in original). A reason cannot be "pretext for [retaliation]

unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (quotation marks omitted); *see also Brooks*, 446 F.3d at 1163 (same).

Here, Richardson argues that she thinks she was unfairly terminated because:

- Richardson complained to several individuals at Hapag-Lloyd about Scallan, but no action was ever taken.  [Doc. 45 at 20].

- Despite little evidence of Richardson's poor performance, Scallan focused on her difficulties with a single vendor, an incomplete GSD, and Richardson's refusal to sign a PIP to paint Richardson as a difficult employee and to give Scallan reason to terminate Richardson if she "exhibited the slightest bit of push-back."  [*Id.*].

As discussed below, these points fail to confront head on Hapag-Lloyd's stated reasons for terminating Richardson's employment.

Richardson first attempts to show pretext by pointing to evidence that despite her complaints about Scallan, no one ever took action against Scallan.  [Doc. 45 at 20].   The evidence shows that Richardson complained formally to HR about Scallan's alleged "intimidation" and "targeting" following the April 9 PIP meeting.  [Richardson Dep. Ex. 39 (Doc. 42-7 at 46–47), 41 (Doc. 42-7 at 49–50); Calello Decl. ¶ 22].  Once Richardson made her complaint, Vaughn contacted HR in New Jersey and followed the instructions given.  [Vaughn Dep. at 45–47].  It is undisputed that the investigation into Richardson's complaints was not completed before Richardson's termination because Vaughn went out on medical leave following an

accident.  [Calello Decl. ¶¶ 25–26].  There is nothing to indicate that any failure to address Richardson's complaints about Scallan somehow shows that Hapag-Lloyd did not in fact terminate Richardson's employment for poor performance and insubordination.  In any event, Richardson's complaints about Scallan miss the mark because it is undisputed that he was not the decision-maker; it was HR Director Calello who made the decision to terminate Richardson's employment.  [Calello Decl. ¶¶ 12–18, 27; Calello Dep. at 68–69].

Richardson also complains that Scallan unfairly critiqued and targeted her, positioning her to be fired if she attempted to push back, but she fails to produce any competent evidence to show that Scallan's complaints about her performance were not legitimate.  Instead, the evidence demonstrates that Richardson underperformed and, at times, was rude to Scallan.  [Calello Decl. Ex. 1].  In any event, as previously noted, Richardson's complaints about Scallan's management style and critiques of her are not relevant because Calello, not Scallan, was the decision-maker here.  [Calello Decl. ¶¶ 12–18, 27; Calello Dep. at 68–69].

Similarly, while Richardson contends that her performance was satisfactory, Hapag-Lloyd disagrees.  In her response, Richardson has come forward with no competent evidence to challenge the veracity of statements from Hapag-Lloyd's witnesses that they thought Richardson's performance was deficient at the time of

the termination.  *See Jurriaans v. Alabama Coop. Extension Sys.*, 806 F. App'x 753, 755 (11th Cir. 2020) ("When an employer asserts that it fired the plaintiff for poor performance, it is not enough for the plaintiff to show that her performance was satisfactory.  Rather, she must demonstrate that the employer did not believe that her performance was lacking, and it merely used that claim as a cover for discriminating against her based on her age.") (internal quotation marks and citations omitted); *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) ("The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head."); *Chandler v. Georgia Dep't of Behav. Health & Developmental Disabilities*, No. 1:18-cv-5876-AT-RGV, 2020 WL 13654303, at *19 (N.D. Ga. June 18, 2020) ("[A] plaintiff cannot show pretext by simply arguing that she did not, in fact, engage in the misconduct of which she was accused by the employer." (alteration in original) (internal quotation marks and citation omitted)), *adopted by* 2020 WL 6867072 (N.D. Ga. Oct. 15, 2020), *aff'd*, 861 F. App'x 296 (11th Cir. 2021).

In sum, to establish pretext, a plaintiff "must meet [the employer's] reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason."  *Chapman*, 229 F.3d at 1030.  Richardson has not met her burden here.   At most, Richardson is simply quarreling with the wisdom of the

reasons proffered by Hapag-Lloyd for her termination.  Richardson, therefore, failed to create a genuine dispute as to pretext, and summary judgment on Richardson's FMLA retaliation claim should be granted on this basis as well.

## B.   Title VII Race Discrimination Claim (Count Two)[7]

Richardson asserts a claim for race discrimination under Title VII.  Where, as here, a plaintiff claims discrimination based on circumstantial evidence under Title VII, courts ordinarily apply the *McDonnell Douglas* burden-shifting framework. *Hester*, 798 F. App'x at 456.

A plaintiff asserting a Title VII race discrimination claim must show that "(1) [s]he was a member of a protected class; (2) [s]he was qualified to do the job; (3)

---

[7] In Count Two of her complaint, Richardson asserted four different Title VII claims: race discrimination, sex discrimination, color discrimination, and retaliation. Hapag-Lloyd moved for summary judgment on all of these claims.  [Doc. 42-14 at 19–25].  Richardson, however, responded only to the arguments relating to race discrimination and did not attempt to carry her summary judgment burden with respect to the sex discrimination, color discrimination, or retaliation claims.  [Doc. 45 at 21–25].   Those claims, therefore, are deemed abandoned, and the motion for summary judgment should be granted on the sex discrimination, color discrimination, and retaliation claims. *See Clark v. City of Atlanta, Ga.*, 544 F. App'x 848, 855 (11th Cir. 2013) (per curiam) (concluding that plaintiffs abandoned their excessive force claim and their state law claims by failing to respond to the defendants' summary judgment arguments relating to those claims); *Adams v. Heinrichs*, No. 1:20-cv-4899-JPB, 2022 WL 4332059, at *5 n.4 (N.D. Ga. Sept. 19, 2022) (finding that a plaintiff abandoned certain claims by failing to respond to the defendants' summary judgment arguments relating to the claims).  The Court, therefore, will address only the Title VII race discrimination claim.

[s]he was subjected to an adverse employment action; and (4) similarly-situated employees outside of the protected class were treated more favorably." *Hester*, 762 F.3d at 456.  Hapag-Lloyd argues that Richardson cannot establish the second and fourth elements of her prima facie case.[8]  [*Id.* at 20–21].

Hapag-Lloyd first argues that Richardson cannot establish the second element of her prima facie case because Richardson was not qualified to do the TDC job. [Doc. 42-14 at 20].  According to Hapag-Lloyd, Richardson failed to produce any competent evidence to show that she was performing her TDC position satisfactorily.  [*Id.*].  In response, Richardson argues that evidence indicates that she "was both qualified and proficient at her role as a TDC." [Doc. 45 at 22].  To support her argument, Richardson points to Harrington's deposition testimony, contending that this testimony shows that she had few performance issues.  [*Id.* at 22–23].  Richardson also contends that "[d]iscussions of a PIP did not arise until after [Richardson] began complaining about [Scallan's] inappropriate fixation on her." [*Id.* at 23].

---

[8] Richardson can satisfy the first and third elements because the undisputed evidence shows that she is Black and suffered an adverse employment action when she was terminated.

The Eleventh Circuit has concluded that a plaintiff failed to show that she was qualified for her position where the plaintiff "failed to present any evidence that she was performing satisfactorily." *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1293 (11th Cir. 2002). Similarly, a district court in this Circuit found that a plaintiff failed "to prove that she was performing to her employer's satisfaction" where the defendants "provided evidence that [the plaintiff] did poorly on a job evaluation, repeatedly disobeyed instructions from her superiors, and made inappropriate phone calls of a personal nature." *Greenfield v. City of Miami Beach, Fla.*, 844 F. Supp. 1519, 1526 (S.D. Fla. 1992), *aff'd*, 20 F.3d 1174 (11th Cir. 1994). Like the plaintiffs in *Williams* and *Greenfield*, Richardson failed to produce evidence (other than her own conclusory assertions) to show that she was performing her job for Hapag-Lloyd satisfactorily. Rather, Hapag-Lloyd presented ample, undisputed evidence showing that Richardson's performance was poor. [Calello Decl. Ex. 1; Harrington Dep. at 109–112, 115; Harrington Dep. Ex. 1].

But even if Richardson had shown evidence that she was qualified for the job, her race discrimination claim would still fail as a matter of law because she has not come forward with competent evidence to establish the fourth element of her prima facie case—that similarly situated employees outside of her protected class were treated more favorably than she was treated. [Doc. 42-14 at 20–21]. To    satisfy

the fourth element of her Title VII prima facie case, Richardson must "identify a comparator outside of [her] protected class who was '*similarly situated in all material respects*,' yet was treated more favorably under the same circumstances." *Hester*, 798 F. App'x at 457 (emphasis in original) (quoting *Lewis v. Union City, Ga.*, 918 F.3d 1213, 1218 (11th Cir. 2019) (en banc)).   A similarly situated comparator ordinarily (1) "will have engaged in the same basic conduct (or misconduct) as the plaintiff," (2) "will have been subject to the same employment policy, guideline, or rule as the plaintiff," (3) "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff," and (4) "will share the plaintiff's employment or disciplinary history."  *Lewis*, 918 F.3d at 1227–1228.   "In cases involving alleged racial discrimination in the application of work rules to discipline an employee, the plaintiff must show either (a) that [s]he did not violate the work rule, or (b) that [s]he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against [her] were more severe than those enforced against the other person who engaged in similar misconduct."  *Moore v. Ala. Dep't. of Corr.*, 137 F. App'x 235, 238 (11th Cir. 2005).   Although Richardson disputes whether she should have been subjected to discipline, she provides no evidence that she did

not make the "myb" response to Scallan, and the record demonstrates that she did indeed make that response.  [Richardson Dep. Ex. 36 (Doc. 42-7 at 41–43)].

Richardson argues that she was treated less favorably than certain unidentified white co-workers who she claims used profanity in Teams chats and were not reprimanded.  [Doc. 45 at 23; Richardson Dep. at 195; Richardson Decl. ¶ 18]. Richardson provides no details or other evidence to support this assertion, nor has she shown that any of these people were similarly situated to her in terms of their employment history with Hapag-Lloyd, their performance issues, or whether they were on a PIP at the time of the profanity use.  [Richardson Dep. at 195; Richardson Decl. ¶ 18].  Moreover, Richardson has not shown that the claimed use of profanity in Teams chats was sufficiently similar to the conduct that ultimately led to her termination—insubordination in the form of not responding to a supervisor and then defiantly telling the supervisor to "myb."  [Richardson Dep. Ex. 36 (Doc. 42-7 at 41–43); Calello Decl. ¶¶ 12–18, 27; Calello Dep. at 68–69].  Richardson, therefore, has not come forward with comparator evidence to make out her prima facie case.[9]

---

[9] In her response, Richardson also points to Vaughn's April 21 email to show that Scallan engaged in a pattern of mistreatment of Black employees.  [Doc. 45 at 23–24].  That email standing alone does not create a triable issue concerning any discriminatory intent on the part of Hapag-Lloyd.  The email does not state, for example, that Scallan actually engaged in a pattern of discrimination; it simply notes that the issues could possibly be viewed as a pattern.  Moreover, Hapag-Lloyd

Moreover, for the reasons discussed above, summary judgment would also be appropriate on the issue of pretext.[10]

## IV.   **CONCLUSION**

Accordingly, I **RECOMMEND** that the Motion for Summary Judgment [Doc. 42] be **GRANTED** and that this case be **DISMISSED**.

Because this is a Final Report and Recommendation, and there is nothing further in this action pending before the undersigned Magistrate Judge, the Clerk is **DIRECTED** to terminate the reference.

**SO REPORTED AND RECOMMENDED**, this the 29th day of November, 2023.

CATHERINE M. SALINAS
UNITED STATES MAGISTRATE JUDGE

---

presented undisputed evidence that the HR department reviewed the situation for each of the individuals listed in Vaughan's email and determined that the actions taken were reasonable and appropriate. [Calello Decl. ¶ 24]. Richardson presented no additional evidence on this point to create a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by Hapag-Lloyd. *See Smith v. Lockheed Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

[10] Richardson did not specifically respond to Hapag-Lloyd's pretext arguments relating to her Title VII race discrimination claim. [Doc. 45 at 21–25]. Instead, she simply argued that she could establish a prima facie case of race discrimination that would give rise to "a rebuttable presumption of discrimination." [*Id.* at 21]. It is not the Court's job to advance pretext arguments on Richardson's behalf or to act as counsel for Richardson. *See Turley v. Vaudeville Cafe, LLC*, No. 1:10-CV-2284-JEC, 2011 WL 3844361, at *3 (N.D. Ga. Aug. 26, 2011).