## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

DANIELLE RICHARDSON,

    Plaintiff,

               v.

HAPAG-LLOYD (AMERICA), LLC,

    Defendant.

Civil Action No.
1:22-cv-03275-SDG

### OPINION AND ORDER

This matter is before the Court on the Final Report and Recommendation (R&R) of United States Magistrate Judge Catherine M. Salinas [ECF 49], granting summary judgment to Defendant Hapag-Lloyd (America), LLC on Plaintiff Danielle Richardson's claims. For the following reasons, the R&R is **DECLINED IN PART** and **ADOPTED IN PART**. Hapag-Lloyd's motion for summary judgment [ECF 42] is **DENIED** as to Richardson's FMLA retaliation and Title VII race discrimination claims but **GRANTED** as to all others.

## I.  BACKGROUND

This is an employment dispute between Hapag-Lloyd, an international shipping company,[1] and Richardson, who worked for Hapag-Lloyd as a dispatcher.[2] A year and a half after starting with Hapag-Lloyd, Richardson took

---

[1]  ECF 43, at 1 ¶ 1.

[2]  *Id.* ¶ 2.

12 weeks of leave to give birth to her daughter.[3] Three and a half months after returning to work, she was fired.[4]

Richardson sued under the Family and Medical Leave Act of 1993 (FMLA) and Title VII of the Civil Rights Act of 1964, bringing three claims—among others that have since been abandoned[5]—premised largely on the alleged misconduct of her direct supervisor, Michael Scallan.[6] First, Richardson asserts that Hapag-Lloyd *interfered* with her maternity leave in violation of the FMLA.[7] Second, she asserts that Hapag-Lloyd fired her in *retaliation* for her taking maternity leave in violation of the FMLA.[8] Third, Richardson—who is black—asserts that Hapag-Lloyd fired her because of her race in violation of Title VII.[9]

Hapag-Lloyd moves for summary judgment on all of Richardson's claims,[10] asserting that Richardson's leave was not interfered with as a matter of law,[11] and

---

[3]  *Id.* at 3 ¶ 13.

[4]  *Id.* at 3, 5 ¶¶ 14, 26, 28.

[5]  ECF 49, at 38 n.7. On these abandoned claims—sex discrimination, color discrimination, and sex retaliation, all under Title VII—Hapag-Lloyd is entitled to summary judgment.

[6]  *See generally* ECF 1.

[7]  ECF 45, at 8.

[8]  *Id.* at 12.

[9]  *Id.* at 21.

[10]  ECF 42.

[11]  ECF 42-14, at 10–12.

that Richardson was fired, not because she took leave or because of her race, but because she was a poor-performing and insubordinate employee.[12] Judge Salinas, agreeing with Hapag-Lloyd, entered an R&R recommending judgment in Hapag-Lloyd's favor.[13] Richardson timely filed objections.[14]

## II.    LEGAL STANDARD

In reviewing an R&R to which objections have been filed, a district court must review the objected-to parts of the R&R *de novo*, 28 U.S.C. § 636(b)(1), provided the objecting party "clearly advise[s] the district court and pinpoint[s] the specific findings that the party disagrees with." *United States v. Schultz*, 565 F.3d 1353, 1361 (11th Cir. 2009). Where the objections are "not specific enough or clear enough to permit the district court to effectively review the magistrate judge's ruling," *Schultz*, 556 F.3d at 1360, the district court must ensure only that the R&R is not "clearly erroneous or … contrary to law," Fed. R. Civ. P. 72(b). A district court may, in its discretion, consider or decline to consider arguments that were never presented to the magistrate judge. *Williams v. McNeil*, 557 F.3d 1287, 1290–92 (11th Cir. 2009). It may otherwise "accept, reject, or modify, in whole

---

12    *Id.* at 13–22.

13    *See generally* ECF 49.

14    ECF 51.

or in part," the R&R's factual findings and legal recommendations under its broad discretion. 28 U.S.C. § 636(b)(1).

## III.   DISCUSSION

The parties dispute whether the R&R properly ruled that Hapag-Lloyd is entitled to summary judgment under Fed. R. Civ. P. 56 on all of Richardson's claims. Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it could change the outcome of the case, and a dispute is "genuine" if a reasonable jury could resolve it in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The purpose of summary judgment is to test "the need for a trial" — to look for "factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250. Thus, at summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. Judges are not to weigh evidence, determine credibility, or draw their own inferences from the facts, these being the proper functions of the jury. *Id.*

Here, Hapag-Lloyd argued — and the R&R concluded — that Hapag-Lloyd was entitled to summary judgment on each of Richardson's still-disputed claims: on her FMLA interference claim because Richardson could show neither

interference with her leave nor prejudice, and on her FMLA retaliation and Title VII discrimination claims because Richardson could not show under the *McDonnell Douglas* burden-shifting framework that she was fired either because she took maternity leave or because of her race. Richardson, in her objections, argues that a factual dispute remains as to whether Hapag-Lloyd interfered with her leave, and as to whether it fired her for an illegal reason.

### A. Richardson Cannot Recover for FMLA Interference Because She Cannot Prove that She Was Prejudiced.

Richardson objects that the R&R misconstrued the relevant evidence in determining whether a factual dispute existed as to interference.[15] Reviewing the R&R's interference analysis *de novo*, the Court adopts the R&R's grant of summary judgment to Hapag-Lloyd because, regardless of whether Richardson suffered interference, no reasonable jury could find that she was accordingly prejudiced.

FMLA interference requires (1) "that [the plaintiff] was denied a benefit to which she was entitled under the FMLA," and (2) "that, as a result, she was prejudiced in some way that is remediable by either damages or equitable relief," *Lapham v. Walgreen Co.*, 88 F.4th 879, 896 (11th Cir. 2023)—that is, it requires both (1) interference and (2) prejudice. The first part—interference—requires the denial of a benefit, and the FMLA entitles employees to two distinct benefits, the denial

---

[15]   ECF 51, at 8.

of either of which is actionable as interference: the right to take leave, and the right to be reinstated upon returning from leave. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015); *see also Lapham*, 88 F.4th at 896 (permitting an FMLA interference claim to be brought either "based on the denial of certain days off," or "based on [the plaintiff's] termination"). Here, Richardson only asserts that Hapag-Lloyd interfered with the former, the right to take leave.[16]

What constitutes "interference" under the FMLA has not been strictly delineated by Eleventh Circuit case law, but the Court can look to the statutory and regulatory text for guidance. The FMLA forbids employers from "interfer[ing] with . . . the attempt to exercise" any FMLA-created right. 29 U.S.C. § 2615(a)(1). Such interference has been interpreted by the Department of Labor to include "discouraging an employee from using such leave" 29 C.F.R. § 825.220(b); *see also Diamond v. Hospice of Fla. Keys, Inc.*, 677 F. App'x 586, 592 (11th Cir. 2017) (relying on § 825.220(b) to determine scope of FMLA interference). By reasonable extension, interference also encompasses pressuring an employee to return early from leave. Unlike in many other employment law contexts, "the employer's motives are irrelevant" for FMLA interference purposes if the claim is

---

[16]   *Id.* at 9 (arguing that Richardson was "denied her right to an effective leave" because Scallan's conduct prevented her from enjoying its full benefit).

(like Richardson's) not premised on the plaintiff's termination. *McAlpin v. Sneads*, 61 F.4th 916, 927 (11th Cir. 2023).

The relevant facts, from when Richardson filed her leave request in August to when she returned from leave at the beginning of February,[17] with certain reasonable inferences drawn in Richardson's favor, are as follows:

1. Richardson filed for maternity leave under the FMLA in August 2020. The relevant paperwork indicated that her baby was due on November 16;[18] that she would be charged for taking leave "11/16/2020 – 02/08/2021 (Approx 12 weeks)";[19] that she would suffer a period of medical incapacity through December 28;[20] and that she would be medically competent to return to work "[a]nytime after" December 30.[21]

2. Richardson began her leave on November 3, about two weeks earlier than the November 16 date indicated on her paperwork.[22]

3. On November 18, two days after Richardson's leave request form indicated she was due (and, in fact, two days after Richardson's child was born[23]), Scallan texted her "How are the systems working?" in reference to her VPN connection.[24] Scallan's subsequent text indicated that he knew that Richardson had

---

[17]   ECF 43, at 3 ¶ 14.

[18]   ECF 42-3, at 26.

[19]   *Id.* at 23.

[20]   *Id.*

[21]   *Id.* at 28.

[22]   ECF 43, at 3 ¶ 12.

[23]   ECF 42-1, at 110.

[24]   ECF 42-4, at 7.

already given birth: "Send *more* pics please of that beautiful baby."[25]

4. The next day, on November 19, Scallan emailed Richardson asking if she would be coming back from work on *December 17*[26] — thirteen days before Richardson's leave request form estimated that she would be medically capable of returning, and over a month before the end of the 12-week period beginning November 3.

5. On November 23, Scallan received confirmation from Hapag-Lloyd's HR Coordinator Katelyn Miranda that Richardson's FMLA leave period extended through January 27.[27]

6. On November 29, Scallan emailed Richardson for confirmation that she would be returning on January 27.[28]

7. On December 2, at Scallan's request, Miranda texted Richardson to confirm she was taking 12 weeks of FMLA leave.[29]

8. On January 8, Scallan texted Richardson "I need to talk to you if available," indicating that the call would be "less than 5 minutes" and include "[s]ome good news you will want to hear."[30] Scallan then called, and what was said is disputed: Scallan claims that he only told Richardson that she had been given a raise,[31] while Richardson claims that Scallan also told her that another Hapag-Lloyd employee who had recently returned from FMLA leave had been fired.[32]

---

[25]  *Id.* (emphasis added).

[26]  *Id.* at 2.

[27]  *Id.*

[28]  *Id.*

[29]  *Id.* at 4.

[30]  *Id.* at 7.

[31]  ECF 42-9, at 97.

[32]  ECF 42-1, at 118.

Richardson argues that a reasonable jury could find that Hapag-Lloyd interfered with her leave if it concludes that Scallan's texts were "unnecessary," that Richardson interpreted his call as a veiled threat of termination, and that Scallan's conduct made her feel "pressured," "anxious," and "scared."[33] This Court has its doubts. The evidence shows that most of Hapag-Lloyd's communications with Richardson concerned her "intent to return to work," 29 C.F.R § 825.311(a), about which it was entitled to inquire. Nevertheless, the record does contain some evidence—Scallan's inappropriate VPN text, his threatening phone call, his somewhat exaggerated persistence—from which a jury could, *perhaps*, scrape together a finding of "interference."

Fortunately, the Court need not take a definitive stand on the interference issue because, even assuming Richardson could show *interference*, she clearly cannot show *prejudice*. As the Eleventh Circuit has explained: "Even if the defendants have committed certain technical infractions under the FMLA, plaintiff may not recover in the absence of damages." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1284 (11th Cir. 1999). And, in the Eleventh Circuit, damages for interference do not include "mental distress or the loss of job security." *Id.*

---

[33]   ECF 51, at 10–11.

For Richardson, mental distress and loss of job security are all that a jury could reasonably find that she suffered. Richardson agrees that she took the full 12 weeks of leave to which she was entitled,[34] and "does not contend that Hapag-Lloyd required or demanded that she perform work while on FMLA leave."[35] She has presented no evidence from which a reasonable jury could conclude "that [Hapag-Lloyd] ever denied her leave, that she would have taken more leave absent [Hapag-Lloyd]'s reaction, or that she lost out on any compensation or suffered any monetary loss because of [Hapag-Lloyd]'s actions." *Moore v. City of Homewood*, 2023 WL 129423, at *10 (11th Cir. Jan. 9, 2023). Richardson, therefore, has failed to prove that "she was prejudiced by anything [Hapag-Lloyd] did." *Id.* The Court accordingly adopts the R&R's conclusion and grants summary judgment to Hapag-Lloyd on Richardson's FMLA interference claim.

### B.   A Genuine Dispute of Fact Exists as to Hapag-Lloyd's Retaliatory and Discriminatory Intent.

The R&R determined that Hapag-Lloyd fired Richardson, not because she took maternity leave or because of her race, but because she was a poor-performing and insubordinate employee. Richardson objects to both determinations. To get past summary judgment, Richardson must demonstrate

---

34   ECF 42-1, at 115–16.

35   ECF 51, at 9.

that a reasonable jury could conclude, given the entire record viewed in the light most favorable to her, that Hapag-Lloyd would not have fired her *but for* her taking of FMLA-protected leave, *Lapham*, 88 F.4th at 893, or *because of* her race, *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 943 (11th Cir. 2023).

Courts often analyze whether a plaintiff has created a triable factual dispute as to these "causation" or "intent" requirements through the three-step *McDonnell Douglas* burden-shifting framework. *See generally*, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1993). First, the employee bears the burden of establishing a *prima facie* case: for retaliation claims by showing that "(1) she engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and (3) there is some causal relation between the two events," *Lapham*, 88 F.4th at 889; and for discrimination claims by showing that "(1) she belongs to a protected class, (2) she was subjected to an adverse employment action, (3) she was qualified to perform the job in question, and (4) her employer treated similarly situated employees outside her class more favorably." *Tynes*, 88 F.4th at 944. Second, the burden shifts to the employer to articulate a "legitimate, nonretaliatory reason for the adverse action." *Id.* Third, the burden shifts back to the employee to show that "the employer's proffered reason was a pretext for retaliation." *Id.*

But as the Eleventh Circuit explained in its recent opinion in *Tynes*, courts should not confuse the evidentiary protocols set forth in *McDonnell Douglas* with

the governing substantive law and procedural rules. *See generally*, *Tynes* 88 F.4th 939. Thus, according to *Tynes*, the *prima facie* case is often miscast as something the plaintiff must establish to avoid summary judgment, when its proper role is as something to draw out the defendant's rebuttal. Once that rebuttal has been drawn out, whether the plaintiff actually established her *prima facie* case is *irrelevant. Id.* at 945. In addition, the use of *McDonnell Douglas* to analyze causation does not change the ultimate question—whether the defendant intentionally retaliated or discriminated against the plaintiff—nor does it diminish the need to "look beyond the prima facie case to consider all relevant evidence in the record" before deciding that the defendant is entitled to judgment as a matter of law. *Id.* at 947. Here, therefore, whether Hapag-Lloyd is entitled to summary judgment depends, not on how Richardson performs under *McDonnell Douglas*, but on the existence of a genuine dispute of material fact as to whether Hapag-Lloyd retaliated against Richardson for taking pregnancy leave or discriminated against her because of her race in violation of federal law.

Applying *Tynes*'s lessons to this case, undersigned as an initial matter declines to adopt the R&R's determination that Richardson's failure to make out her *prima facie* case entitles Hapag-Lloyd to summary judgment.[36] As *Tynes*

---

[36]   ECF 49, at 33, 42.

explained, Richardson's *prima facie* case is a means to an end, and that end—Hapag-Lloyd's articulation of a legitimate reason for Richardson's termination—was achieved when Hapag-Lloyd came forward with evidence that Richardson was a poor-performing and insubordinate employee.[37] At that point, the Court had "all the evidence it need[ed] to decide" the ultimate issues, and Richardson's ability to make out her *prima facie* case lost its relevance. *Id.* at 945. Rather than "revisit whether the plaintiff established a prima facie case," the Court moves on to the dispositive question: "whether there is a sufficient evidentiary basis for the jury to find that the defendant intentionally discriminated [or retaliated] against the plaintiff." *Id.* at 947.

But before it can do so, the Court must resolve another threshold issue: whether Scallan's conduct is probative of Hapag-Lloyd's intent, as an evidentiary matter, in light of Defendant's throwaway assertion that Scallan was not a "decisionmaker."[38] The summary treatment that this issue has received is somewhat surprising given its critical importance. Most of the record evidence from which a jury could infer illegal intent—if not all of it—involves Scallan. Thus, a ruling that categorically excludes Scallan's conduct from consideration at

---

[37]   ECF 42-14, at 16–18.

[38]   *Id.* at 22.

summary judgment would all but end Richardson's case. The Court declines to so end it at this juncture.

As the Eleventh Circuit explained in *Steger v. General Electric Co.*, whether a given statement can be used to prove an employer's illegal intent is a question of evidentiary relevance. 318 F.3d 1066, 1079 (11th Cir. 2003). "Any believable evidence which demonstrates a genuine issue of fact regarding the truth of the employer's explanation may sustain the employee's burden of proof." *Id.* It is into this context that the Eleventh Circuit has placed Justice O'Connor's guidance that courts inquiring into an employer's intent disregard "statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring). Here, Hapag-Lloyd's explanation is that Richardson was fired for poor performance and insubordination, and the record suggests that Scallan—as Richardson's immediate supervisor—was both responsible for monitoring her performance and reporting her insubordination.[39] The record further suggests that Scallan was, in fact, involved in the process that led to HR Director Mariel Calello's decision to fire Richardson.[40] Under these facts, the Court agrees with Richardson

---

[39]   ECF 43, at 2 ¶¶ 6, 8.

[40]   ECF 42-13, at 4 ¶¶ 12–17.

that her firing does not rest "solely on [Calello]'s shoulders,"[41] and declines to impose a categorical rule that Scallan's conduct is irrelevant to the real reason for Richardson's termination.

With that, the Court reaches the ultimate issue: "if the evidence, viewed in the light most favorable to [Richardson], would allow a reasonable jury to infer that [Hapag-Lloyd] engaged in intentional retaliation [or discrimination]." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1310 (11th Cir. 2023). In the *McDonnell Douglas* context, these ultimate issues are analyzed through the framework of "pretext." But courts must keep in mind that *McDonnel Douglas* is just that: an "evidentiary framework" by which to evaluate a claim, not the claim itself. *Tynes*, 88 F.4th at 947. The substantive issue, regardless of how courts choose to organize and analyze the evidence, is retaliation or "discrimination *vel non*." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 518 (1993). The inquiry into pretext, therefore, must always be an inquiry into pretext *for retaliation or discrimination*. *Id.* at 516. The dispositive issue under *McDonnell Douglas*—pretext—must be legally equivalent to the dispositive issue under Title VII: retaliation or discrimination.

For this reason, undersigned declines to adopt the R&R's determination that Richardson failed to show pretext on both her FMLA retaliation and Title VII race

---

[41]   ECF 51, at 17.

discrimination claims. The R&R rejected both claims for the same reason:[42] the lack of "any competent evidence to show that Scallan's complaints about her performance were not *legitimate*."[43] And while the Court agrees with the R&R that Scallan's complaints about Richardson's performance were likely legitimate—that there is every indication Hapag-Lloyd *could* have fired Richardson for her performance—the legitimacy of Hapag-Lloyd's stated reason is not the dispositive issue under Title VII. After all, Hapag-Lloyd *could* fire anyone for *any* reason—"a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all"—as long as the reason is not illegal. *Gogel*, 967 F.3d at 1148. Thus, the dispositive question under *McDonnell Douglas* at summary judgment is not whether Hapag-Lloyd's *stated* reason was *legitimate*, but whether its *actual* reason was *illegal*. Because the R&R did not squarely answer this dispositive question, undersigned analyzes whether a reasonable jury could find Hapag-Lloyd's explanation pretextual *de novo*.

To show pretext, the plaintiff must show "*both* that the reason was false, *and* that [retaliation or] discrimination was the real reason." *St. Mary's Honor Ctr.*, 509 U.S. at 515. As the Supreme Court explained in *Hicks*, the two halves of the pretext inquiry as a practical matter merge: "[P]roving the employer's reason false

---

42   ECF 49, at 43.

43   *Id.* at 36 (emphasis added).

becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional [retaliation or] discrimination." *Id.* at 517. But, in this case, the Court believes it helpful to break the pretext inquiry down into its constituent parts and begin by focusing on the first—whether Hapag-Lloyd's reason is false—because the record contains evidence from which a reasonable jury could infer that Hapag-Lloyd is not telling the whole story about Richardson's termination.

According to Hapag Lloyd HR director Calello, Richardson was terminated for (1) "performance issues,"[44] and (2) an act of insubordination on May 14, 2021, in which Richardson told Scallan to "myb," meaning "mind your business."[45] But the record, viewed in the light most favorable to Richardson, contains evidence tending to undermine both reasons. First, a jury could question whether Richardson's performance was poor enough to explain away her termination on its own. Hapag-Lloyd employee Devin Harrington, who worked on the same team as Richardson,[46] testified that her performance was "up and down" and "average," with some "things that were missed" and problems involving a particularly demanding trucker named Gina, but getting "better overall at the …

---

[44]   ECF 42-13, at 4 ¶ 17.

[45]   *Id.* at 3–4 ¶¶ 15–17.

[46]   ECF 42-11, at 48.

job."[47] His testimony indicates that Richardson was neither an inspiration to her co-workers nor a calamitous liability, but an average or slightly-below-average performer. A reasonable jury could doubt whether such performance sufficiently explains Richardson's termination, especially in light of record evidence that Hapag-Lloyd managers at the time were systematically retaining poor-performing employees for "fear of not getting replacement[s]."[48]

Second, a jury could question how large a role the May 14 incident actually played in Hapag-Lloyd's decision, when the record suggests that Scallan had decided he wanted Richardson fired sometime in February or March, and subsequently spent the following two months agitating to HR and collecting documentation in support of that goal. According to Calello, Scallan began reporting Richardson's performance issues to her "in early February 2021," "[w]ithin a few weeks of Plaintiff's return from leave."[49] There is evidence that Scallan had decided that he wanted Richardson fired no later than March 24, 2021, the day he emailed his supervisor Diana Collar[50] a laundry list of "[i]ssues" concerning Richardson's performance.[51] Then, on April 6, Scallan evidently spoke

---

[47]   *Id.* at 50, 54.

[48]   ECF 42-10, at 68.

[49]   ECF 42-13, at 3 ¶ 10.

[50]   ECF 43, at 2 ¶ 6; ECF 45-8, at 1 ¶ 6.

[51]   ECF 42-10, at 64.

with HR Manager Heather Vaughn about Richardson's termination and was advised—to his frustration—that he needed to provide "supporting documentation" of Richardson's issues "to avoid any potential legalities arising out of a possible/eventual termination for her."[52] On April 7, Collar indicated to Vaughn that "a lot of discussion" had taken place on the propriety of firing an employee for violating the terms of a performance improvement plan (PIP) under which insubordination was punishable by "immediate termination."

Two days later, on April 9, Richardson was called into a meeting with Scallan and Collar for the purpose of putting Richardson on a 30-day PIP,[53] under the terms of which she could be terminated for failure to "[m]aintain professional demeanor[ ] and courteous communication" with other employees—in other words, for insubordination.[54] The context for the meeting, as afterwards reported to Calello by HR Director Lisa Lorelli,[55] was that Scallan and Collar were "looking to terminate Danielle Richardson," that Scallan had been advised by Vaughn that he should not fire Richardson before "put[ting] her on a warning," and that Scallan had accordingly convened the meeting to "prepare[ ] the warning"—presumably

---

[52]   *Id.* at 68–69.

[53]   ECF 45-8, at 4 ¶ 8; ECF 48, at 2 ¶ 8.

[54]   ECF 42-7, at 2.

[55]   Lorelli was filling in for Vaughn. ECF 45-4, at 16–17.

a reference to the PIP—"and … issue[ ] it."[56] In addition, Lorelli's email could be read as signaling HR's discomfort with the idea of Scallan firing Richardson without warning, given his history of "various employee relations issues," his "more stern, less tolerable management style," and the fact that Richardson had just "returned from leave after having a baby on 02/01."[57] (Scallan's "employee relations issues," it turned out, included "a pattern … which could be potentially viewed as discrimination."[58])

The April 9 meeting itself went very poorly: in Lorelli's words, "it started out ok, but then became derailed and ended up as a heated discussion,"[59] with a "very upset" Richardson crying for long stretches. The meeting was accordingly paused without resolution, with a plan to "regroup[ ] on Tuesday," April 13.[60] Instead, beginning on April 13, Richardson left for two and a half weeks of paid leave,[61] and the regrouping never occurred. Nor did Richardson ever sign the PIP.[62] Richardson claims that on April 26, while on paid leave, she was emailed

---

[56]   *Id.* at 140.

[57]   *Id.*

[58]   ECF 42-10, at 86.

[59]   ECF 45-4, at 140.

[60]   *Id.*

[61]   ECF 45-8, at 5 ¶ 10.

[62]   ECF 42-1, at 129.

the PIP and asked to sign it;[63] she refused, believing that some of the performance concerns that Scallan had raised at the April 9 meeting were unwarranted, and that a PIP was not appropriate before that meeting had been reconvened.[64] On May 11, the day before the PIP period was set to expire, Richardson was informed over email that the PIP period had been extended through June 2.[65] This occurred at 1:07 pm.[66] By 2:32 pm, Scallan was again highlighting Richardson's performance issues to HR and asking "Grounds for termination? Or do we have to wait until the end of the PIP?"[67] Scallan, it turned out, did not need to wait: Richardson was fired three days later, after telling Scallan to "myb," pursuant to a three-word email from Calello to Lorelli: "Release her – insubordination."[68]

These messy facts leave room for a jury to reasonably disbelieve Hapag-Lloyd's version of the story—that Calello fired Richardson for insubordination and poor performance—and instead believe Richardson's: that she was fired because Scallan singled her out for adverse treatment.[69] A jury could choose to

---

[63]   ECF 45-3, at 3 ¶ 12.

[64]   ECF 42-1, at 129.

[65]   ECF 45-4, at 154.

[66]   *Id.*

[67]   *Id.* at 152.

[68]   ECF 42-10, at 96.

[69]   ECF 51, at 15.

give little weight to Calello's statement that Richardson was terminated for her "insubordination on May 14" and "her significant previous performance issues,"[70] if it concludes that the May 14 incident was the coup-de-grâce of a Scallan-driven campaign to create a facially legal justification for an employment action that had been contemplated for months in advance. A jury might also wonder why the record contains so little evidence of the quality of Richardson's performance before November 2020, when she left for maternity leave. For example, Richardson's only formal performance evaluation seems to have been completed in February 2021, after she returned from leave.[71] Scallan likewise seems to have first informed Calello of Richardson's performance issues in early February. And Scallan apparently did not begin documenting Richardson's performance failures until late March. A jury could conclude that the best evidence of Richardson's pre-leave performance is Harrington's testimony, and doubt whether "up and down" and "average" performance, without more, would have been enough to result in termination. Thus, viewing the entire record in the light most favorable to Richardson, a jury question exists as to whether Hapag-Lloyd's reason for Richardson's termination is false, and pretext for *something*—pretext for whatever

---

[70]   ECF 42-13, at 6 ¶ 27.

[71]   ECF 42-1, at 136; ECF 42-9, at 61.

motivated Scallan, in early 2021, to start pushing for Richardson's termination in the first place.

Of course, under the FMLA or Title VII, "pretext for something" is not enough. Even if a jury accepts Richardson's version of events, it need not find that Scallan's conduct was therefore illegal. As *Hicks* explained, casting doubt on Hapag-Lloyd's justification may "considerably assist[ ]" Richardson's enterprise of proving illegal intent, but cannot replace it. 509 U.S. at 517. Thus, although a jury's "rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination," it does not compel such an inference. *Id.* at 511 (emphasis in original). That is certainly the case here, where a jury could well conclude that Scallan targeted Richardson and pushed her out for a *legal* reason. Perhaps Scallan and Richardson simply did not get along, and he wanted her fired because he disliked working with her. Perhaps Richardson's lack of discipline irritated Scallan, and he wanted her fired to put an end to her continued insolence. Perhaps Scallan was exasperated by Richardson's poor performance, and he wanted her fired because her mistakes were impacting his responsibilities as a manager. All of these narratives have some support in the record, and none of them, on their face, implicate the FMLA or Title VII.

The question in this case is therefore not only whether a jury could find Hapag-Lloyd's explanation *false*, but whether it could also find Richardson's

accusation *true*. Richardson can avoid summary judgment only if the record contains sufficient evidence from which a reasonably jury could conclude, not only that Scallan disliked Richardson enough to get her fired, but that his dislike was fueled by retaliatory or discriminatory animus. The Court rules that the record contains enough to support either finding.

First, a jury could find that the best explanation for Scallan's animus is racial discrimination, based primarily on two pieces of evidence. One is an email exchange between Calello and Vaughn in which Vaughn identified "a pattern within [Scallan]'s team which could be potentially viewed as discrimination," and provided the following list of Scallan subordinates who had complained of discrimination:

1.   Shonnette Green, an African American (dismissed);

2.   Kammal King, an African American (dismissed);

3.   Shamonica Jones, an African American (dismissed);

4.   Estrellita Hayden, an African American (failed to receive training);

5.   Charissa Cunningham, an African American (failed to receive training);

6.   Danielle Richardson; and

7.   Woonhak Kim, an Asian American (dismissed).[72]

---

[72]   ECF 45-7, at 81.

24

The other piece of evidence is Harrington's testimony that Scallan's team, which during Richardson's time at Hapag-Lloyd numbered 12–14 people split roughly halfway between white and non-white,[73] by May 2023 was down to five people, of whom four were white, and none were black.[74] Richardson has additionally introduced evidence that Scallan did not discipline his white dispatchers for insubordination as strictly as he disciplined Richardson, and that Scallan allowed his white subordinates to curse on Microsoft Teams with impunity (the same messaging platform on which Richardson told Scallan to "myb").[75]

This evidence creates a genuine dispute as to Scallan's discriminatory intent. The existence of a genuine dispute, of course, does not preclude Scallan from presenting the factfinder with a compelling, racially neutral reason for his pattern of conduct. It is possible, for example, given the small size of Scallan's team, that his black subordinates were systematically less competent at their jobs, and as a group more vocal with their complaints, than his white subordinates. But a jury could reasonably interpret Scallan's managerial record differently, as proof of racial animus. And a jury that reasonably finds Scallan capable of treating his black subordinates more adversely because of their race could reasonably find that

---

[73]   ECF 42-11, at 92.

[74]   *Id.* at 93.

[75]   ECF 45-3, at 4 ¶ 18.

Scallan discriminated against Richardson because she was black. Richardson's Title VII race discrimination claim will therefore proceed to trial.

Second, a jury could find that the best explanation for Scallan's animus is Richardson's maternity leave. Richardson's strongest evidence of retaliatory intent is temporal proximity: her return from leave on February 1,[76] combined with the launch of Scallan's campaign for her termination no later than March, and perhaps as early as the first few weeks of February. Richardson could bolster her FMLA claim with evidence of Scallan's conduct *during* her leave: asking about her VPN connection two days after she gave birth; asking if she would return to work six weeks early; calling to tell her that her co-worker had been fired a month after that co-worker had returned from FMLA leave. Richardson might also point to Lorelli's suggestive statement that "[Collar] and [Scallan] are looking to terminate Danielle Richardson, who returned from leave after having a baby on 02/01,"[77] and to the fact that she was fired soon after putting in a request for five additional weeks of parental leave under Hapag-Lloyd policy.[78] This evidence would support a jury finding that, had Richardson not left for maternity leave in

---

[76]   ECF 43, at 3 ¶ 14; ECF 45-8, at 2 ¶ 14.

[77]   ECF 45-4, at 140.

[78]   ECF 42-10, at 95.

November, she would not have been fired in May. Richardson's FMLA retaliation claim will thus also proceed to trial.

## IV.    CONCLUSION

The R&R [ECF 49] is **ADOPTED IN PART** and **DECLINED IN PART**. Hapag-Lloyd's motion for summary judgment [ECF 42] is **DENIED** as to Richardson's FMLA retaliation and Title VII race discrimination claims but **GRANTED** as to all others. The parties are **ORDERED** to file a joint Proposed Pretrial within 30 days.

**SO ORDERED** this 31st day of March, 2024.

_____
Steven D. Grimberg
United States District Judge

27